***********
This matter was reviewed by the Full Commission based upon the record of the proceedings before Deputy Commissioner Stanback along with the briefs and arguments on appeal. The appealing party has not shown good ground to receive further evidence or to amend the prior Opinion and Award. Accordingly, the Full Commission adopts and affirms, with some modification, the Deputy Commissioner's holding and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. At the time of the alleged injury by accident, the defendants were subject to and bound by the provisions of the Workers' Compensation Act.
2. New York Insurance Company was the carrier on the risk.
3. On July 7, 1998 the plaintiff sustained a bee sting while performing work at Somerset Apartments.
In addition, the parties stipulated into evidence three packets of medical records and reports. Also, medical records from the plaintiff's time in prison were subsequently received into evidence.
 ***********
Based upon the evidence of record, the Full Commission enters the following:
 FINDINGS OF FACT
1. The plaintiff, who was forty-seven years old at the time of the hearing before the Deputy Commissioner, began working for the defendant-employer on June 24, 1998. He had previously been working as a truck driver and had done some roofing work on a self-employed basis. After quitting his truck-driving job with All South Deliveries, he was approached by his nephew, Stacy McCurry, who asked if he would be interested in working for Steve Broadwell, Mr. McCurry's father-in-law, who operated a painting company. The plaintiff had done some roofing work for Mr. Broadwell in the past and was interested in the job.
2. Prior to this discussion, Mr. Broadwell had entered into a contract with Tri-State Management (Tri-State), a company that managed the Somerset Apartment complex in Asheville. The apartment buildings needed painting, but there were areas where the exterior wood was rotten and needed to be replaced before the surface was painted. The contract between the parties stated fixed prices for the painting of the eighteen buildings, but the parties agreed in a separate provision that the defendant-employer would provide the labor to replace the rotten wood and Tri-State would provide the materials. The labor was to be billed at the rate of $20.00 per hour.
3. The work provided in the contract began by May 1998. The defendant-employer hired Mr. McCurry to tear out and replace the rotten wood and agreed to pay him $20.00 per hour for the work since he would be providing many of the tools for the job. At the beginning of the job, Mr. Broadwell took Mr. McCurry to the job site and showed him what needed to be done. Although Mr. McCurry understood that there were no set working hours, the carpentry work had to be done steadily in order for the carpenters to stay ahead of the painters. There was a second person hired to do wood removal work, as well, but that worker quit in early to mid June. Mr. McCurry, who was treated as the foreman on the job with respect to the carpentry work, then sought an additional worker. Consequently, he contacted the plaintiff. Mr. Broadwell had told him that the other worker would be paid at the rate of $10.00 per hour, so this information was conveyed to the plaintiff who accepted the job.
4. During the time he worked for the defendant-employer, the plaintiff worked from 8:00 a.m. to 4:30 p.m. with a thirty-minute break for lunch, in accordance with instructions from Mr. McCurry, unless they ran out of materials. In that event the men would leave early. Mr. McCurry showed him what he was supposed to do. Mr. Broadwell would come out to the job site every day to check the progress of the work. The plaintiff provided his own hammer and nail apron, but the rest of the tools were provided for him. Apparently the saw, the crow bar and other similar tools were supplied by Mr. McCurry, but the defendant-employer provided the scaffolding. The plaintiff worked under the direction of Mr. McCurry and was subject to termination by Mr. Broadwell. He was not free to hire an assistant and was not self-employed with an independent carpentry business at the time in question. However, he did have some past experience in carpentry work.
5. Mr. Broadwell paid the workers every two weeks. Because he did not realize the plaintiff and Mr. McCurry were employees, no deductions were taken from their paychecks.
6. The plaintiff's average weekly wage while working for the defendant was $360.00. This amount was determined by adding twenty-five dollars to his earnings for the two-week period since he was injured two and one-half hours before he would have stopped work for the day.
7. Over the course of his employment with the defendant-employer, the plaintiff had several encounters with insects that he thought were yellow jackets. They would come out of the wood on the buildings as he was removing rotten sections. The maintenance staff at the apartment complex gave him some insect spray to use to kill them. At approximately 1:30 p.m. on July 7, 1998, he was working on building number 6 and was standing high enough on a ladder so that could reach behind the gutter to pull out rotten lumber. As he was pulling off some wood, a bee or yellow jacket came out of the building where the wood had been removed and stung him on the top of his nose between his eyes. Since he had previously had an allergic reaction to a bee sting, he climbed down the ladder and went around to the side of the building where Mr. McCurry was working. He asked Mr. McCurry to take him home so that he could take some medicine. However, he then became short of breath.
8. Mr. McCurry drove the plaintiff to a nearby fire station where he was given two shots of epinephrine for anaphylactic shock. He remained short of breath and had chest tightness in addition to hives and nausea, so an ambulance was summoned to take him to the hospital. Once he was in the emergency room, an EKG was administered which revealed abnormalities. Consequently, the emergency room physician consulted with Dr. Kutob, the plaintiff's family doctor, and the plaintiff was admitted to the hospital. Further testing indicated that the plaintiff had sustained a non-Q-wave infarction, a form of heart attack. The doctors treated him with medication and his symptoms and EKG abnormalities resolved.
9. On July 8, 1998 the plaintiff developed recurrent chest pain, so Dr. Kutob consulted with a cardiologist, Dr. Hanich, who ordered a cardiac catheterization. The test was performed that day and it revealed no evidence of significant coronary artery obstructive disease. However, the test did show mild left ventricular dysfunction.
10. By July 10, 1998 the plaintiff was complaining of severe chest and abdominal pain. Multiple tests were performed that day which indicated that he had suffered a type III aortic dissection, a very serious condition involving tearing of the lining of the aorta. Dr. Claxton, a cardiovascular surgeon was consulted on an emergency basis and he performed surgery to repair the aorta on July 11, 1998. As a result of impaired blood supply for the dissection and the surgical procedure, the plaintiff developed spinal cord ischemia that caused him to become paraplegic. Consequently, after his condition was stabilized, he was transferred to Thoms Rehabilitation in order to undergo a spinal cord treatment program. However, on the date of transfer, he developed a pulmonary embolism and had to be readmitted to the hospital.
11. The plaintiff was subsequently referred back to Thoms on July 25, 1998 and he received rehabilitation therapies there until his discharge on September 25, 1998. He continued to require treatment thereafter for problems associated with his paraplegia. As of the date of hearing, his paraplegia had not resolved and appeared to be a permanent condition.
12. The defendants have denied this claim on multiple grounds. However, the plaintiff did sustain an injury by accident arising out of and in the course of his employment with the defendant employer on July 7, 1998. The fact that a bee or yellow jacket stung him constituted an usual occurrence that interrupted his regular work routine. The accident arose out of and in the course of his employment. Although the defendants offered evidence from Dr. Ambrose, a preeminent authority on social stinging insects, to the effect that the plaintiff was not at an increased risk of being stung on July 7, 1998, even Dr. Ambrose admitted that generally speaking someone whose job involved tearing out rotten wood at the eaves of buildings would be at an increased risk of being stung by a yellow jacket or bee. The problem in this case was that he did not believe that the evidence established the presence of a bees' nest in the area. However, he appeared to overlook or disregard the fact that the bee or yellow jacket which stung the plaintiff came out from behind the wood the plaintiff was removing.
13. Due to his work activities, the plaintiff clearly disturbed the insect that stung him on July 7, 1998. He was required to work around soffits, eaves and other areas of the apartment buildings where bees and yellow jackets were known to nest, and the vibration caused by moving his ladder as well as the wood removal activities would disturb the insects and cause them to respond defensively. His work activities placed him at an increased risk of being stung by a bee or yellow jacket as compared to the general public not so employed.
14. As a result of the bee sting on July 7, 1998, the plaintiff developed a severe allergic reaction. His subsequent myocardial infarction was a proximate result of either the allergic reaction or the two injections of epinephrine he was given to treat the allergic reaction. However, the subsequent aortic dissection was not proven to have been a proximate result of the bee sting, the treatment for the bee sting or the resulting heart attack. It was a coincidental development and the plaintiff was fortunate to have been in the hospital when it occurred since he was able to get prompt evaluation and treatment there.
15. Although the plaintiff clearly could not have worked during the hospitalization for his heart attack, he would have been discharged by July 11, 1998 for that condition. The evidence did not address subsequent disability arising just from the heart attack. Consequently, the plaintiff did not prove that he was unable to work more than seven days as a result of his injury by accident.
16. The plaintiff sustained damage to his heart in the form of mild ventricular dysfunction as a result of the injury by accident giving rise to this claim. However, the evidence did not explain the nature of the permanent damage. The heart is a very important internal organ. Consequently, any permanent damage would be significant. The fair and equitable amount of compensation under the Workers' Compensation Act for the permanent heart damage is $20,000.00.
17. Although the defendants have raised notice as a defense, Mr. Broadwell was advised of the injury on the day it occurred and he visited the plaintiff in the hospital. Consequently, he had actual knowledge of the incident and was not prejudiced by any delay in receiving written notice.
 ***********
Based upon the foregoing findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. On July 7, 1998 the employee-employer relationship existed between the plaintiff and the defendant-employer in that the plaintiff was not engaged in an independent business, he worked under the supervision of Stacy McCurry, he was being paid by the defendant-employer on an hourly basis, he was subject to discharge and he was not free to hire assistants. G.S. § 97-2; Hayes v. Board of Trustees of ElonCollege, 224 N.C. 11 (1944).
2. On July 7, 1998 the plaintiff sustained an injury by accident arising out of and in the course of his employment with the defendant-employer in that he was at an increased risk of being stung by a bee or yellow jacket as compared to the general public not so employed. G.S. § 97-2 (6).
3. The heart attack the plaintiff suffered following the sting was proven to have resulted from the injury by accident. However, the aortic dissection was not proven to have been a proximate result of this accident. Click v. Pilot Freight Carriers, Inc., 300 N.C. 164 (1980).
4. The plaintiff's claim is not barred by his failure to give written notice of his injury to his employer within thirty days in that the defendant had actual knowledge of the injury and was not prejudiced by the delay in receiving written notice. G.S. § 97-22.
5. In that the plaintiff did not prove that he was disabled as a result of this injury by accident after July 11, 1998, he is not entitled to compensation for temporary total disability. G.S. § 97-28.
6. As a result of the July 7, 1998 injury by accident, the plaintiff has sustained permanent damage to his heart, an important internal organ, for which he is entitled to compensation in the amount of $20,000.00. G.S. § 97-31 (24).
7. The plaintiff is entitled to have the defendants provide all medical compensation arising from this injury by accident. However, he is not entitled to have the defendants to provide the medical treatment for his aortic dissection or the resulting paraplegia. G.S. § 97-2(19); G.S. § 97-25.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission affirms the holding of the Deputy Commissioner and enters the following:
 AWARD
1. The defendants shall pay compensation to the plaintiff in the amount of $20,000.00 for his permanent heart damage, subject to the attorney's fee hereinafter approved.
2. The defendants shall pay all medical expenses incurred by the plaintiff as a result of this injury by accident. However, the defendants are not liable for medical bills arising from treatment for the plaintiff's aortic dissection and resulting paraplegia.
3. An attorney's fee in the amount of $ 5,000.00 is hereby approved for the plaintiff's counsel, which fee shall be deducted from the aforesaid award and paid directly to Ms. Arcuri.
4. The defendants shall pay the costs.
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/____________________ THOMAS JEFFERSON BOLCH COMMISSIONER